Rastani, who is the Chief Judge of the Court of International Law, or Trade? Trade. Trade. Did it right yesterday. CIT. Judge Rastani helps us out frequently, and we're delighted to have her. So, on behalf of the entire Court, but especially on behalf of Judge Ambrose and myself, welcome. Thank you. We'll hear the first case, which is United States v. Booker. Good morning. Good morning. Tom Young, on behalf of Christopher Booker. Okay, you better move the mic. That's better. Okay. You know, we tape you, and then we listen. I've been informed of that, unfortunately. And we will not erase it. Okay. You may want Good morning. Tom Young, I represent Christopher Booker, and with permission of the Court, I request three minutes of rebuttal time. That's granted. Thank you. And may I begin? Yes. Thank you. I think the government and I are both in agreement that the three issues that we'd like to explore during this oral argument are, one, the first one being the expectation of privacy Mr. Booker had in the hotel room, and whether or not he gave up that right to the expectation of privacy by placing guns in a grease basket. Two, if the Court agrees with the defendant, the appellant here, that he did not do so, whether or not exigent circumstances existed sufficient to allow the police officers to enter that hotel room. No. Here you have a maid who's allowed in the room, correct? That's correct. As in all hotel rooms we go into. The maid sees something that's very disturbing. As I understand it, in fact, so Well, there's another explanation for that. She sees two guns in a waste basket. Correct. What is she supposed to do? I think she did what she was supposed to do, which is inform management, and management did what they were supposed to do, which is inform police. Just very briefly, I'd like to point out two things, if I might. One, I would like the Court to imagine that this takes place actually in somebody's home, and somebody has a cleaning service that comes twice a week, Tuesdays and Thursdays. They know the person comes Tuesdays and Thursdays. They know the person will be there at a certain time and actually give a key to that person. The person comes into the room and finds in a waste basket in that person's home, two guns. I will concede that there is a right of privacy in a hotel room while you are currently renting the hotel room. But I'm also reminded that David Frederick, who's a well-known appellate attorney who has appeared before the Supreme Court a number of times, said that one of the most egregious mistakes he ever saw someone make before the Court during oral argument was to say that you have the same right of privacy in a hotel room that you have in your home. No, that's not the case, and I wasn't suggesting that to the Court, but I was trying to make an analogy so the Court could see that under no circumstances would a court find that to be a relinquishing an expectation of privacy in the home. Now, a hotel room is not that far removed, though. The Courts do agree that it's similar to a tenant who occupies a room, a paying tenant, or a person in a boarding house, which are very closely associated to the one's rights in a home. So although the Court is correct in stating that they're not exactly the same, they're very, very close. So if the maid did the right thing, the person who was in charge did the right thing by calling the police, what should the police have done? The police should have gotten a warrant. Would it have been okay for them to disable the room door? To disable the room door? Well, I would suggest to the Court that there's a few things they could have done that she was not to. One, the record seems to be clear, based upon the hotel manager and both patrolman Patinga, that the ability to check to see whether or not someone had actually was in the room or not. They have a key card that can check and see whether or not someone has actually come back to the room. One of the things they could have done was seen if the room was actually occupied or not. They could have then held the area for safety purposes while they went and attempted to get a warrant telephonically. Whether or not a magistrate would have granted a warrant based upon the evidence that they had is something we'll never know, but it's something that they could have done had that warrant been issued telephonically. They could have then been in the same position they were except legally and justifiably with a warrant because a magistrate would have seen the probable cause of maid determination, which is the province solely of a magistrate absent a couple of key things like exigent circumstances or abandonment, which I don't believe we have here. Okay, let's fast forward from three o'clock when this roughly when this occurred, is that correct? About seven o'clock when we came back, you to me, um, it's a bully finds the guidance around 2 30. Let's assume for the moment that the police did everything you suggest they should have done. They went out and they got a warrant, but they were still in the process of getting the one. So assuming I presume in the meantime they were disabled the door, the person comes up, the door doesn't work. Do the police have a right at that point, based on what they know, that the person has a criminal record that made has reported this person who has a criminal record, nonetheless has guns in the room and do they have the least have the right to do a Terry's search? Terry, stop briefly. It's an interesting issue because the record and let me put it this way. If the police officers knew for a fact that Mr Booker had a conviction for a felony and one that was enumerated that they didn't know he had a conviction, right? Yes. But what is unclear from the record is what it was for. When did they know that? What's that? When did they know that you say that she found the gun at 2 30 and he returned at what time? He returns about five hours later. Okay. So when did the police know? According to Sergeant Pincus, at some point after he arrived on the scene and he was not one of the first responders, he came after people who rediscovered the guns. But before Booker arrived, he apparently asked detectives that were on the scene to go ahead and try and ascertain what kind of record Mr Booker had because he was unsatisfied with the fact that they had not done so to his satisfaction. What the record shows is that according to both patrolman Pincus who talked about the numerous violent arrests and that they believe that there is a conviction for a violent... When? I'm just trying to do the timing of this. Between 2 30 and 7 30. So by 7 o'clock they knew that he had some kind of record. Yes, but it's unclear on the record what it was for. And what time did they enter the room? Probably around 2 45 or so. I see. So they entered the room before they knew he had a record. Yes. And to be clear though, to be fair to the court, it's a bit ambiguous as to what patrolman Patinka's knowledge was of Christopher Booker's record. He had some indication previously that Mr. Booker had maybe a warrant for his arrest. He was unclear about it and he never conveyed that information to any other officers on the scene, at least not on the record that we have before us. And officer patrolman Patinka was not one of the arresting officers. Let's go back at 7 30 or thereabouts. Yes. You would think a police officer in that circumstance would at least be concerned about his security, would he not? Yeah, if the court is inquiring whether or not reasonable suspicion, maybe stop and frisk existed, I would not try to argue firmly that it doesn't. I would suggest that at that point in time you may very well have reasonable suspicion to stop and frisk Mr. Booker as he arrives on the scene. So the cocaine charge would be not fruit of the poisonous tree. I would not agree with that because one of the doctrines that would take place is that the officers believing that there's a possibility Mr. Booker's armed and dangerous would be able to do a pat down. They would not be able to examine his pockets, they would not be able to manipulate objects. Whether or not, and we'll never know this, whether or not the cocaine would have been patted him down. But unlike a gun, had Mr. Booker had a gun, I think we could all infer that obviously the police would have found that at that point. Having two bags on you of cocaine, there's not really a record of what they were shaped like or whether or not any of the officers had the kind of knowledge and ability to immediately tell whether they were. I would suggest to the court that we don't have the kind of record to make a conclusion that had they stopped and frisked him, they would have then lawfully recovered the cocaine. So you're suggesting that to do what? There should be a remand? I would suggest to the court that there should be a remand on that finding, first of all, if the court believes that the guns were removed illegally, absent the warrant, which I strongly suggest. Well, they're different issues. He was convicted both on the guns and on the cocaine. That's correct. Judge Ambrose is questioning you, as I understand it, about the cocaine. So I don't see why your answer, which said something about the guns, really was responsive to his question. I apologize to the court. There are two issues. One, it seems to me that if the court finds that the guns were recovered from the hotel room, there may be a court may believe that that somehow adds probable cause to the arrest of Mr. Booker. I don't necessarily think it does. And perhaps I incorrectly misinstill what Judge Ambrose is asking me. Well, no. But Judge Ambrose's question were really right to the point, which is that they could reasonably have found the cocaine before they knew, before they entered the room. Based upon the maid saying that she found some guns and the information provided to officers by the hotel manager, I understand that point. And my response to Judge Ambrose was that I thought that perhaps reasonable suspicion did exist, but not full-blown probable cause. And my suggestion to the court is that without probable cause, none of us here can say with any certainty whether or not the cocaine would have been discovered. Uh-huh. And because we've had cases where police have testified that the cocaine was in a bag and it was obviously feelable when they patted down a suspect. That's a case-by-case analysis. Often that depends upon the officer's experience with narcotics and the type of packaging that was recovered at that time. But these were narcotics detectives. They were part of the narcotics group, right? There's a point in the briefs on that. We don't have anything on the record exactly what their knowledge of narcotics is. But some of them at least were narcotics officers. That may be, but we don't know what their familiarity is with large packages of cocaine. Well, how much cocaine did they find? Over 45 grams. In excess of 50 grams of cocaine. I don't know about cocaine. In two packages. Is that a pretty big package? Well, 149 grams is a little bit under 10 ounces. It's like 9 ounces, 8 ounces. So there were two bags. So you had approximately two 4.5 ounce bags that were recovered. So they're not huge. Can I ask a question? Yes. The gun crime here is in possession with narcotics transactions. So if the cocaine falls, everything falls? Is there another gun charge? No, there are two separate ones. One is a person, a felon, essentially. Oh, a felon in possession charge as well. And then the separate charge of the cocaine. The one thing that happens because it's a drug and gun charge, is that in this situation the gun charge is mandated to be a consecutive sentence to the drug charge. Okay, all right. So it is two separate things. Yes. Okay, thanks. But there's no using in connection with a drug transaction. After yesterday's Supreme Court opinion, I think we have to ask about that. I'm sorry. I don't quite understand the courts. Is there any charge? Is there anything charging use of the gun and the narcotics connected together? Well, in this situation it was. No, the charge. What were the charges? He was charged with 922-G, which is a gun charge. Yeah. And he was also charged under the cosmetic statute, health and safety of the federal laws for drugs. What about the statement that he made when he was arrested? If the court believes that the arrest was illegal at that time, then obviously it flows not from a Fifth Amendment right, but from a Fourth Amendment right. I'm not suggesting that it's a Fifth Amendment issue because I think it's agreed by all parties that it's a spontaneous statement made by Mr. Booker. Thank you. Can I just want to clarify that again? I guess I'm confused by something I'm reading in your brief. You have him charged with three things. I'm sorry. The court could point to the page. Page three. Conspiracy to possess and distribute cocaine. Possession with intent to distribute. Possession of firearm and furtherance of drug trafficking. I don't see firearm, felon in possession. I'm sorry, Your Honor, yes. That's the five-year consecutive sentence that follows from the drug. I apologize, the court hadn't handled the case below. Okay, so there is no felon in possession. No, Your Honor, you're correct. All right, thanks. Oh, wait a minute. Let's go back. Go ahead. No, go ahead. I was going to ask something in connection with the arrest. You talked about whether the attorney stopped by one to explore the possibility of whether there was a probable cause to arrest him. If you've got a situation, you're a police officer, and you know the maid has reported guns in the room, whether you were right or wrong to go in the room and verify that, so be it. But irrespective of that, you've got a person you know who's got a criminal history. You saw one of the police officers saw this person loitering around 5, 6 a.m. in the morning on a previous day, and there's a warrant for his arrest. Wouldn't you, as a police officer, almost automatically arrest him? What's interesting about that is I agree with the court that Patrolman Patinga apparently had knowledge of a warrant. If Patrolman Patinga had, on the record, showed that he conveyed that information to any of the other officers with some degree of accuracy or that he actually ever did it, I would agree with the court that, you know what, I think that they had every reason to arrest at that point. For whatever reason, it is absent of what Patrolman Patinga told the other officers. Patrolman Patinga was not one of the arresting officers. He actually left before Booker returned to the hotel room. He was unclear what the warrant was for, but I agree with the court that's not so important. If there was an actual warrant for Mr. Booker's arrest and the arresting officers had knowledge of that warrant, that would indeed make Mr. Booker's position a bit untenable. However, in this situation, Patrolman Patinga never conveyed that information to any of the arresting officers. So, to the best of our knowledge, on the record, the arresting officers that arrested Christopher Booker at 7.30 had no knowledge that a warrant existed. And, again, I would just point out to the court that the knowledge about what type of convictions Mr. Booker had are vague, ambiguous, and sometimes even inconsistent. There is no sense of what it's actually for. They point to violent arrests. In fact, they claim that he has a conviction for one violent arrest, which is actually not true. Mr. Booker did not have any convictions at that time for any violent offenses. He did have one drug conviction for which he received probation. So, the officers were unclear about this. Was that a state or a federal conviction? It was a state case coming out of Pennsylvania. It was a felony or misdemeanor? It was a felony. Possession with intent to deliver. Okay. I'd like to understand a little better what your argument, now that we understand that he wasn't charged with a felon in possession. It makes it really different. Your argument about the no abandonment and the failure to get a warrant then goes only to the third charge. Is that right? Possession of a firearm in furtherance of a drug trafficking. What was the sentence on that? Well, one, is that right? I mean, because from what you have said in response to Judge Ambrose, I gather that we could, based on the record, affirm the two drug charges. It turns out he was only convicted on one drug charge. He was only convicted of? Yeah, so you could affirm one drug. Which one was it? I should know this. He was convicted of a conspiracy. Oh, the first charge. He was acquitted with, I'm going back to page three, which Judge Rossani called our attention to. Possession with intent. He was acquitted of, or you dropped it? Of the conspiracy. Conspiracy to distribute. He was acquitted of that. Oh, he was acquitted of the conspiracy. But convicted of a substantive drug charge as well as the gun charge. Okay. And for the gun charge, he received a five-year consecutive sentence to the 20-year sentence he received for the possession of the drugs and the intent to distribute. Okay. And now what is your complaint about the possession with intent to distribute? I understand the court's point. I understand Judge Ambrose's point. I think Judge Ambrose has gotten to the crux of what is potentially the most tenuous part of Booker's argument. I believe the much firmer ground stands on the guns in the hotel room. Okay. However.  For the drug, yes. As Judge Ambrose was asking me, he suggested to me that if officers had the knowledge that Mr. Booker had convictions making him ineligible to possess firearms at that point in time, wouldn't they have sufficient knowledge at that point to have the ability to make an arrest? Is that when they searched him and got, when did they find the cocaine? They found it at 730 when they arrested him when he came back to the hotel room. When they arrested him. Yes, they found it immediately. Your challenge to the cocaine charge is you think it has to be, is this right? You think it has to be remanded so that a record could be made as to whether they knew that he had a conviction? I think that two things need to be done. First of all, I would suggest to the court right now that the record is not clear that the officers knew that Christopher Booker had a conviction that would make him ineligible to have a firearm. I'm not talking about the firearm. I understand that, but my point is this, Your Honor, is that if they understood that he had a conviction, one of the enumerated convictions that would not allow him to possess a firearm, then I would agree with Judge Ambrose that at that point the officers would have probable cause to make an arrest. Because based upon him being the occupant of the hotel room, based upon their knowledge that he had a conviction which would not allow him under any circumstances to possess firearms, at that point in time they would have probable cause to make an arrest. However, the record is not sure that any of the officers were aware that he had one of those types of convictions. In fact, they actually seem to be a bit inaccurate in their knowledge of what occurred. If this were a situation where they actually were given misleading information but acted upon it in good faith, that would be different. But apparently from the record, the officers just never had a clear sense of what Mr. Booker's actual record was. Because they didn't have a sense of what his actual record was, they didn't know with any type of certainty necessary for probable cause to determine whether or not he was someone that could not in any circumstance possess firearms. Absent that, I would suggest that what they had, given the totality of the circumstances, would be reasonable suspicion to stop Mr. Booker and pat him down to see if he was at that point in time armed. And that's what I said to the court earlier, it would be impossible for anyone to know whether or not, at this point with the record we have before us, whether or not they would have discovered cocaine on Mr. Booker's person from a pat-down on the outside of his person. Okay, thank you. Thank you very much. Thank you. My name is Joseph Labrum, I'm an assistant United States attorney appearing on behalf of I believe the United States of America. Now your office frequently comes before us and admits that which, or concedes that sometimes you can't sustain a position. Do you have any reason to excuse the failure to get a search warrant? I know they weren't federal, they weren't federal officers were they? They were state officers. They were all Atlantic City police officers. I mean the feds would have known better, presumably. I think that there were very unique exigent circumstances that, in the minds of the officers at the time, judged at that time, impelled them to take immediate action rather than delay and obtain a search warrant. What exigent circumstances? They knew the guy was out. And the maid had just been in the room, and she didn't identify anybody else as being in that room. That's correct, your honor. But there was a time period that had passed between the maid's discovery of the 2-bedroom trash can. 230 and 240? They entered, I mean he said they entered at 240? 245. 245? I think it's closer to approximately 3 p.m. they made the entry. Okay, no, but there's no evidence that anybody returned to the room. And you could also tell by the key card system. There were multiple entrances to this hotel from which one could gain access that were not visible to the lobby. It's true that the lobby clerk had seen the occupant, Christopher Booker, and his companion leave earlier in the morning, but had not seen them return. Yeah, but the maid went in at 230. I don't think that the record is clear that the maid actually went in at 230, your honor. She reported in at 230? I think she had been in there in the afternoon. It's not clear exactly what time she made entry, but there was clearly a time period between her discovery and her report to the management, the hotel manager. You're not telling us that you think the maid saw the two guns and went on and cleaned the rest of the rooms on the floor without telling anybody? But there was a period of time, your honor, because after the maid reported it and she had to enlist the assistance of a houseman to convey this to the manager, the manager then contacted patrolman Patenga, a friend of his, and asked for advice as to what to do. There was a period of time that lapsed between the time that that call was made and Patenga arrived. But you also could have found if anybody had entered the room. I mean, what you're trying to say is maybe somebody entered the room, but how could they? If you knew, if you could go look at the card system that they had under, I guess, under the computer and see if anybody had entered the room from X time to X time or to Y time? Your honor, there was no evidence that there was any ability of management to check the card. I thought that it was stated in the briefs that there was the ability to check to see if a card had been used within a particular period of time. That perhaps there was, your honor. I don't recall that testimony. I tried this case. I handled the suppression matters. I do not recall that testimony as being offered by the hotel manager. However, there was also testimony that there were rooms that had adjoining doors so that there was a possibility that a person could gain entrance from another room. But wouldn't the officers, or wouldn't the management of the hotel know if three-oh-eight and three-oh-nine are connected? Well, three-oh-eight and three-oh-nine were across the hall from one another. They could not be connected. Whatever it is. Three-oh-nine and three-ten perhaps could have been. Perhaps. And there was a concern. There was a concern that these officers had. There was a concern that the manager had for the safety of his employees and all the hotel guests. If there was such a concern, why was it that the officers had the manager of the hotel open the door when they went in to look? With guns drawn, I might add, Your Honor. And that was because of concern for their own safety. The guy in the line of fire would be the manager if there was really a problem. Right? Your Honor, as I recall the testimony, the manager stuck the key card in the door, moved, quickly stepped aside, and the officers went in with guns drawn. As if there could have been someone in that hotel room. We read about what happens with the Atlantic City officers. Going back to Judge Smollett's first question, if you've had four to five hours, even if you're waiting across the hall, even if you've disabled the mechanism for getting into the room, why wasn't somebody at least attempting to find a magistrate to get a warrant? At that point, Your Honor, they had had to remove the guns. The guns were removed somewhere around 330. Where does that get you? I mean, I really have no problems with the guns in the wastebasket. I say, the maid can take them out in the hall and hand them to the police. But where does that get you? How does that get you in a position where you can search for cocaine to get convictions? So just tell me how... Your Honor, there was a clear abandonment of these guns in the trash can. I have no problem with the guns. I have a problem with the guns. He may have a problem with the guns, I have no problem with the guns. I just don't see logically how that gets you to the arrest and the search. How do the guns get you anywhere? Well, once the guns are confirmed to be in the room, there's the knowledge that the person has a conviction, he has a history of violent arrests. Wait, wait, wait, wait. At the time they arrest him, and the time they search their room, what do you know about him that enables you to make an arrest? Because that's basically what you can do here. You can make an arrest if you've got enough. In New Jersey, there's a presumption that possession of a firearm... So this all hangs on the New Jersey presumption. That's correct, Your Honor. There's a presumption that a firearm was possessed unlawfully in New Jersey, and all the officers testified that that was their knowledge. They knew that this defendant had a conviction. So that's what this really hangs on. It's not exigent circumstances, the fact that because he has guns and there's a presumption that he holds them illegally, at that point they can arrest him. And then they can pat him down. That was the basis for the probable cause to arrest. All right, so that's kind of interesting. That's actually interesting to me that this presumption then is the whole reason that you think you can arrest him. I don't know about a separate search of a hotel room, but it sort of hangs on this presumption. Did the arresting officers know about the warrant? Yes, Your Honor. At the time they arrested him? Clearly knew about it. He wasn't there. He was there earlier in the day, and he conferred with all the other officers before he left. Did anybody give any evidence that he communicated that knowledge to anybody else? Is it on the record? I don't have a place in the record where it was communicated. However, there was testimony that Patinga conferred with the other officers involved and advised them of all of the details that he was aware of. But there's nothing in the record that says he told them that there was a warrant. There was an extensive effort during the afternoon headed up by Sergeant Pincus to find out more about this individual's record. But they searched the room before that. They did a very limited scope retrieval of the weapons. They did not search the entire hotel room, Your Honor. Unlike Judge Rastani, I'm not convinced about abandonment of the guns just because they were in a hotel room. They're not in the waste paper basket in the hall. They're not in the curb. They're in the room. Now, you don't know. They're actually in a bathroom, Your Honor. What's wrong? They're in the bathroom. Well, sometimes people put things in waste paper baskets that they intend to retrieve. I'm one of them. Sometimes they get there just, you know, you're not thinking. You put something down in the waste paper basket. You come back and you say, oh, my God, where's that check? And then you go rummaging, and there it is. We don't know. Did he testify at all as to Mr. Booker, as to why he put the guns in the waste paper basket? He probably didn't testify. Okay. Well, his lawyer was smart. And, Your Honor, perhaps one does place objects in a trash can. In a hotel room, there is a presumption that goes with renting a hotel room that a maid is going to come in and remove that trash. That's true. That is abandoned property. Well, there's no Supreme Court case. There's no decision from the Supreme Court. No, the Supreme Court cases don't cover this situation. They cover trash outside, but they don't – do you know? The Elmdale decision discussed the search of a trash can contents in a hotel room. In the room? Yes, Your Honor. Well, it's a room that had been abandoned already. That's correct. But your question is whether that sentence in a bail refers to trash cans in a room that has not been vacated. That's right. Or whether they're considering it in the context of the room that's been vacated. I'm not entirely sure what they meant in bail. I think it's different – if you put something in a trash can inside your house, it's different than putting it in a trash can in a hotel room where you know a maid may pick it up. I still don't know where that gets you in this case. Unless it's 100% – to me, 100% your case relies on the New Jersey presumption. It's an important presumption, and the officers did know, Your Honor, and we would say that they had collective knowledge. They did know that this individual had conviction. They knew that he had a violent criminal record. That was all information that they had. They also knew that there was a warrant. When did they know all that? Not when they first went in. My question is when they first went into the room. When the maid reports it to the manager, the manager tells the police. All that's perfectly appropriate. How long does it take? Magistrates, you can call up on the phone and say to a magistrate, this is what happened, can I have a search warrant? The magistrates in this circuit, at least in this district, will act very quickly. The testimony on that point, Your Honor, was that they were all uniformly concerned that this person could come back at any time. They didn't know whether they had enough time to secure a warrant. They wanted to avoid a dangerous situation. Did they try? The question is – I mean, it's hard because we're asking a federal officer to respond with respect to action by state officers who don't follow federal guidelines. We know that. We're being hard on you, but you're proceeding on the basis of what the state people did. And our question was, did they try? Did they attempt to get a search warrant? The answer that I can tell you, Your Honor, is no. They did not attempt because of what they perceived to be the existence of these exigent circumstances that created a danger to them and to hotel guests. Were the exigent circumstances created a danger? There was nobody in the room. But the guns were there, and this was not an exigency that the police created. They were placed there by the defendant. Exigent circumstances means an emergency, right? Yes. I mean, it's usually what it means. Where's the emergency here if they've disabled the room, even if they had left the guns in the wastebasket? Well, before they were able to disable the room, Your Honor, and prevent the person from gaining entry, they did not know whether someone was in there or had returned and had access to those guns. They could have had a policeman standing outside to protect if anything happened. But again, Your Honor, there was a time delay between the report of the guns and the arrival of the police. They did not know whether anyone had returned in that time period. That's not true. There were three separate entrances. They were not monitored. The person could have come back, and there was a genuine concern of the management of the hotel as well as the police for their safety. Tell us about the drugs. Is the drug conviction dependent in any way upon the guns? Well, the government contends that there was clearly probable cause to arrest the defendant at the time he returned to the room about 7.30 p.m. So you take police officers knowing that there are guns in the room, and so Booker comes back, and they arrest him. They know he's got a conviction. Okay, so they arrest him. Did they know that he had a conviction by 7.30 p.m.? Oh, yes, absolutely, Your Honor. But did they know that the conviction was a felony by 7.30? Your Honor, the record doesn't disclose whether they actually knew that. However, what it does establish is that they knew that he had this conviction for a crime. They could have done a Terry search. They could have done a Terry search. Now, do we know whether a Terry search would have uncovered the drugs? Likely it would have, Your Honor. At the time of his arrest. How big are four ounces of Narcan? I don't know. Well, it was about five ounces, and it was crack cocaine packaged in two separate bags. So crack is little… It's chunky, off-white substance, and it was described as such. It's not a powder. It's not a powder. So where was the cocaine? It was in pockets of a jacket that the defendant was trying to shield after he was directed by the police to get down on his knees and put his hands up. Ah. The officer, I believe it was Sergeant Pincus, kept away the jacket and then examined it in search incident to arrest fashion to see whether it had any objects that could perhaps harm him. There were no guns in the jacket, but only the two packages of crack cocaine. To help Judge Slover, is four ounces of crack about the volume of half a cup? Yes, I would say. Yeah, isn't that about it? I would say, Your Honor. That's correct. Okay. So did the police know at 730 then that there was a warrant out for… We don't know because we know that Patinga knew it. We knew that Patinga had at least some conversations with other officers, but we don't know for sure if Patinga had communicated to those other officers that there was a warrant out for the arrest of the defendant here. Is that correct? I believe that's correct, Your Honor. But our position would be that the knowledge of one officer is the knowledge of all. Ah. And clearly they conferred with one another. What rule, what Supreme Court case or Third Circuit case says knowledge of one is knowledge of all? That's an interesting concept. I don't have a case for that proposition, but that's our position, Your Honor. Right. Tell me… With regard to the… Wait, wait, wait. Tell me again clearly the government's position. Is your position that we can sustain the narcotics conviction, the drug conviction, even if we are not persuaded by the government's argument with respect to the guns? That would be our position, Your Honor. However, with regard to the abandonment issue, I think that there's another Supreme Court case not cited in our brief that is instructive on this issue, Rekas v. Illinois 439… Tell us, tell us and spell it out. R-E-K-A-S v. Illinois 439 U.S. 128. Why wasn't it in your brief, if it's relevant? Well, Your Honor, it simply is… I mean, you have great brief writers. I know that from experience, one of them sitting in the room. Absolutely. And Mr. Zausner has assisted me on this. So what kind of case is this? Are you blaming Mr. Zausner for this? It's a search of a vehicle, Your Honor. But I think what it does is it focuses the issue of the reasonable expectation of privacy in a particular area. In this case, our view is that he had no reasonable expectation of privacy in the contents of that trash can through the guns. Yeah. And… You have to win on either one or the other, right? Or do you? Do you have to win on abandonment? I win on both, Your Honor. Okay. She's not talking about the crimes. She's talking about the theories. Yes. In order for this not to go back to the district court for more fact-finding, you have to win on either exigent circumstances or the abandonment in the trash can, one or the other. Yes, Your Honor. Because the point is… Okay. It wasn't trying to help you with respect to the Terry stop. If you have a jacket that is not on the person… But it's connected to the person in this case. But he's been kicked away. Well, it was still within the immediate area of the arrest. But he can't get to it so that you could argue. I mean, there's a good argument that the officers are no longer worrying about their security. How can you go a pat-down of an empty jacket where there's no human being inside the jacket? Your Honor, I believe that the empty jacket is still in the immediate vicinity. It's within his control. He could perhaps get out of the floor. He was down on the floor. They were cuffing him, weren't they? They were attempting to get control. And the officers kicked the jacket down the hall. So how in the world is this guy going? I mean, he's not… He was protecting it as if he wanted to retain the jacket. How many officers were there? I believe there were two officers at the time. All right. I mean, it would be a stretch for us to say you could do a tear stop on an empty jacket. You would have to be pursuant to an arrest. So you need a probable cause. In our view, and as the district court found, Your Honor, there was probable cause because even if the court forgets the entry into the room, there was knowledge that there were these two guns there. There was also knowledge that he had a conviction. There was also the fact that there was a presumption against possession of a weapon. But presumption against possession of a weapon, does that give you probable cause to arrest? It certainly may give you… I think it does, Your Honor. And I think that's our position. And I think that's what the district court found, that in any event, there was probable cause to arrest the defendant at the time he was arrested at 7.30 p.m. in the hotel hall room. How do we get across our strongly held view that you have to get search warrants and still sustain this conviction? Your Honor, I think this is a very unique situation, and that is why a search warrant wasn't obtained. If you look at it from the point of view of the officers at the time, they had this circumstance of two guns, not one, but two, one of which ultimately turned out to be a murder weapon, but that's not part of the record on this. And you shouldn't tell us. These circumstances were so unique, and I want you to come back and answer Judge Lohner's questions, because that's really the crux of where we are. If it was so unique, didn't you in effect concede earlier that if these were federal officers, they would have gone for the warrant right away? I did not concede that, Your Honor. Even if they believed there were exigent circumstances, and they would still nonetheless have gone for a warrant, look at the rest of the room. They didn't do it. There was a fundamental thing missing here. They didn't get a warrant, they didn't try to get a warrant, and they had four to five hours to do so. And I think the reason for that, Your Honor, was because of what they perceived the situation they were in. They had two guns in a room. They didn't know whether anybody was in the room or not. But they could look in the room without going into the bathroom where the guns were. They knew the identity of the room occupant, Your Honor. They knew that he had a criminal record of violent arrests, and they also knew, based on Officer Patenga's information, that there was a record of violent arrests. I thought he had a criminal record for possession of drugs. There was a record of violent arrests as well, Your Honor. You better tell me what that was. Well, one of them was a robbery case. The conviction was actually for a possession with intent to deliver controlled substances in Philadelphia. And is it on the record that the police knew of that? They knew of the conviction, Your Honor, and what is not true of the record is exactly what the conviction was. You can't impute that to their knowledge. They knew the guy was convicted of possession of drugs at some point. Yes, Your Honor. They did not know if it was a felony or a misdemeanor, and they didn't know all the circumstances behind it. But they had reviewed a rap sheet that had a list of multiple arrests, some for violent offenses, and they were aware of that. The arresting officers had reviewed a rap sheet, don't you think? Yes, they did obtain that. Before the arrest? Before the arrest. Yes. The arresting officers had reviewed the rap sheet before the arrest, and that's in the record. The two arresting officers. I believe it is, Your Honor. It was an effort spearheaded by Sergeant Pincus, and he had reviewed that. They also obtained a picture of the defendant from the local prison, and they had that. How did they do that? They have little things that they get a picture. How did they get a picture? Apparently, inmate records provided this. Yeah, but how do you physically get a picture unless they had one of these  I believe it was faxed, Your Honor. I'm not certain. I don't know whether the record clearly reflects how they obtained it, but they did say they obtained it. I can figure that out. Okay. Do you think so? If I just may. Go ahead. Sure, because we asked you a lot of questions. In the Recus case, contraband was discovered in a locked glove compartment underneath a front passenger seat. There was a driver and multiple passengers in the car, That's the case you didn't tell us about. That's correct. The Supreme Court held that the passengers could not legitimately expect privacy in the areas which were the subject of the search, the glove compartment under the seat, because they couldn't have a reasonable expectation of privacy. Cars are cars. Cars are cars, but this was a specific area of the car, and I think it goes to our argument that Mr. Booker could not have had a reasonable expectation of privacy in the contents of that trash can where he placed those weapons. Thank you very much. It's an interesting case. Mr. Lebrun. No, I'm sorry. That was Mr. Lebrun. Mr. Young. Mr. Young. May I? Okay. Tell us about whether you agree with all the facts we just heard. A couple of things, and then I would like to address Judge Custodio's question about the New Jersey statute. Yes, but about the facts. My understanding is that the patrolman that first arrived— Did you try this, by the way? What's that? Did you try this case? No, I did not. Okay, perfect. The patrolman, Batinga, he is the one that on the record is apparently aware of a warrant. Judge Amber was asking earlier to the government whether or not that information was conveyed. To the best of my knowledge, on the record, there is no evidence that that was actually conveyed to any of the arresting officers. Patrolman Batinga was actually gone by the time that Booker was arrested, so that the officers that were there for the arrest, that being Sgt. Pincus— Are you saying that there's nothing on the record to show communication between Batinga and the other officers? Correct, regarding the warrant. As far as the rap sheet— What about communication about anything? There was discussion about talking to the other officers. Again, it is ambiguous and sometimes amorphous and difficult to know exactly what officers— Let's find out what they knew about the rap sheet, the arresting officers. My understanding, and again, the record is 200 pages, so it's dense, but my best understanding is that what they did was they called back. None of them had anything on their person to actually print up a sheet, but they were getting information conveyed to them by telephone by people back at their district. That's my best understanding. If I am at all worth representing, I'd be glad to have the court look more closely at it. But my understanding of it is that's where they get any information that they get. It's information conveyed to them by people not in the hotel area. May I just address Judge Gibristani's questions about the statute briefly? There's some confusion about the statute. What that New Jersey statute is, it is a jury instruction, and what it stands for is for when a person has been charged with a possessory offense of a weapon, that after the case has been tried, at the end of it, if it is absent on the defendant's record of any showing that a permit actually existed, then the court instructs a jury. They may, if they so choose to, make a permissive presumption that indeed no permit does exist, but they are allowed to, if they want, also discard that. That's what that statute stands for. Do you have a number? I'm sorry. Is that in the briefs? Yeah. Okay, well, if it's in the briefs, I'll find it again. Or my law clerks will. They'll find everything. Go ahead. I'm a Pennsylvania lawyer, so these statutes are new to me, too. But the statute that... 2C39-2B, 5B. Right. There's actually two of them, and what they are is they are jury instructions. They are not legislative... It's in the briefs. They're not legislative commands to officers about what amounts to probable cause. The interesting case about this is Valentine. It's a Third Circuit case, and what's interesting to note about that case is, although the issue wasn't reached, they decided that the officers had the requisite probable cause to make an arrest of a man with a gun after a tip was given to them and other information was in the knowledge of the officers. So they did make an arrest. It was found to be lawful and constitutional. But the court in Valentine makes mention of the injurity statute. However, they do not actually go so far as to address it. And it's interesting to note that if it were such a completely categorical sentence that you can't make an arrest based upon that statute, that that's what it allowed to, I think the Valentine court would have said so. That is an issue that is still left up in the air in the Third Circuit. As of this point in time, there is no case that suggests mere possession of a firearm in New Jersey allows for police officers to automatically have probable cause. If Mr. Booker had had no conviction whatsoever, I would suggest to the court strongly that maybe the reasonable suspicion would not exist to stop and frisk Mr. Booker. However, because on the record it is clear that the officers had some knowledge that Mr. Booker had some type of past, whether it be for arrests and or a conviction that they weren't clear about, I would agree with the court, Judge Ambrose's point, that officers at that point in time do have reasonable suspicion to stop and frisk based upon that information. But it does not go so far as to rise to the level of probable cause, full-blown probable cause, to make an arrest. And Judge Ambrose asked the government briefly about the jacket. He mentioned Chamel, and that case is a probable cause case. Of course, that's the classic grabbing area. Once a lawful arrest has been made, the police officer is a free search incident to arrest both the person's actual person as well as the immediate grabbing area. However, if only reasonable suspicion exists, then Judge Ambrose's point is well taken, that that search of the jacket would not be a lawful one if it's only reasonable suspicion that exists at the time. He didn't make that point. He asked some questions. But is your bottom line here that what should happen if you win on everything is that it goes back for fact-finding? Or are you saying there's grounds for you to win outright? There's two looks at that, and courts are different. Some courts believe that the government gets one bite of the apple, that they don't have the ability to go back and somehow connect the dots appropriately because of absence in the record about officers not telling other officers about whether or not they had the warrants given to them. You know, to go back now and ask Officer Patroling Patinga, oh, did you tell one of the arresting officers that you knew about the warrant? Oh, yeah, I did. There's a lot of courts that find that to be problematic. I'm not suggesting to this court what it should do. But on the other hand, there are some courts that suggest that the record is what it is, and the government's had a shot at showing that there was a lawful arrest made and that all seizures were lawful and constitutional. And if they haven't shown that, then the only course for the court at this point in time is to vacate the sentence. And we may end it back, but I don't know what they would do with it if the court suppresses the guns and the drugs. Okay. Mr. Young, you're not on the brief, right? But you're with the Federal Public Defenders? Yes, I am. Oh, okay. And one of my colleagues, and I think it's probably a good idea, thinks that we ought to get this transcribed. So we'll ask the government to arrange that. And as the government knows, when I participate in this, I ask that the transcript be read by both lawyers, not to change anything, but if there's any obvious error to you that when it comes to us it doesn't have, it's not erroneous. Okay? Thank you. Does the court have any further questions? No, thank you. That's fine. Thank you. Thank you. It's interesting. Thanks.